**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

EUGENE GILYARD, *et al.*  :  CIVIL ACTION
                          :
          v.              :  NO.  16-2986
                          :
DENNIS DUSAK, *et al.*    :

## MEMORANDUM

KEARNEY, J.                                                    June 29, 2017

In October 2013, the Philadelphia Court of Common Pleas vacated the life sentences of two men for a 1995 murder after evaluating the merits of a third person's 2011 and 2013 confessions to committing the same 1995 murder.  Months later, the District Attorney dismissed all charges against the two formerly incarcerated men.   Released after sixteen years in prison, the two men now seek damages from the arresting detectives for malicious prosecution.  They also seek damages from the City of Philadelphia for failing to train and supervise its detectives on reciting the totality of circumstances, including exculpatory information, in the affidavit of probable cause given to a judge asked to sign an arrest warrant in early 1998.  Following extensive discovery into the detectives' investigation and police protocol from almost two decades ago, genuine issues of material fact requires our jury determine whether: (1) the arresting detectives initiated their prosecution without a truthful affidavit of probable cause by allegedly citing fabricated evidence, statements from coerced witnesses, and omitting mention of credible exculpatory witness statements; and, (2) the City failed to train its detectives as to when to include exculpatory evidence or failed to supervise in light of adduced evidence supervisors approved affidavits of probable cause knowing they excluded exculpatory evidence.  The two formerly incarcerated men now withdraw their state law claims and cannot adduce evidence as to one of the detectives and we dismiss those claims.

I.      **Undisputed Facts**[1]

At approximately 2:35 A.M. on August 31, 1995, Philadelphia Police officers responded to a radio call for a "shooting and a hospital case on the highway."[2]  They saw the victim, Thomas Keal, on the ground on the 3600 block of North 17th Street in Philadelphia, Pennsylvania.[3]  The officers saw Mr. Keal with a gunshot wound on the side of his head and a shotgun wound on his right knee.[4]  An ambulance took Mr. Keal to the hospital where he died from his injuries later in the day.[5]

A.      **The 1995 investigation.**

The 39th District of the Philadelphia Police assigned Detective Joseph Centeno as lead detective and immediately began investigating Mr. Keal's murder.[6]

*Autopsy results*

Doctor Lieberman timely conducted an autopsy on the body of Mr. Keal.  Dr. Lieberman found the suspects shot Mr. Keal four times and he suffered two penetrating gunshot wounds to the head, one perforating gunshot wound to the head, and one perforating shotgun wound to the right knee.[7]  He found none of Mr. Keal's gunshot wounds were at close range.[8]  From September 1 through 18th, 1995, the detectives conducted civilian interviews with witnesses and police interviews.

*Patrick Harris*

On September 1, 1995, neighbor Patrick Harris told the police he did not see the shooting from the steps of 1824 Atlantic Street but he heard a "loud blast and then two popping sounds. Within one minute 2 [black males] came running west on Atlantic Street and the lighter-skinned of the males dropped a handgun then picked it up. He also saw a sawed-off shotgun in hand of the dark skinned one."[9]  Mr. Harris told the police the males turned left on Gratz Street and went

into house number 3621 North and then came out a few minutes later to get into a white car with Pennsylvania plate no. G-7814.[10]  Mr. Harris described the black male with the sawed-off shotgun as 18 to 20 years old, dark complexion, around 5'10"-5'11" with a thin build, and around 165 pounds.[11]  The man wore a white tank top and he had a shirt in his hand which partially covered the sawed-off shotgun.[12]

Mr. Harris told the police the man who dropped the gun as light-skinned, 5'10"-5'11" and around 150 pounds.[13]  He wore a white t-shirt, light blue jeans, and a silver belt.[14]  The detectives did not show Mr. Harris a photographic array in his interview and he did not identify either black male.[15] Mr. Harris also told the detectives Keith Williams was with him when he witnessed the males running on Atlantic Street.[16]

### Police Officer Terry Brown

Officer Terry Brown of the 39th District worked the 8 A.M. to 4 P.M. tour of duty on August 31, 1995.[17]  Her superiors instructed her to watch a white Pontiac with a Pennsylvania plate no. HPG-7814 and stop anyone who got into the car.[18]  Officer Brown saw a black male get into the vehicle and drive away.[19]  She followed and stopped the vehicle at 19th and Venango Streets and transferred the driver to homicide.[20]  At homicide, the driver gave his name as Byron Felder but officers later identified him as Edward Felder *a.k.a.* Robert Felder.  Officer Brown returned to the car and then the car owner approached and identified himself as James Thomas.[21]  She transported Mr. Thomas to homicide.[22]  The homicide detectives did not record interviews with Robert Felder or James Thomas.

### Avis Ford

Also on September 1, 1995, the detectives interviewed Avis Ford.  Ms. Ford told the police she witnessed Mr. Keal speaking with two black males from her vehicle's side view

mirror.[23]  Ms. Ford saw one of the black males had a sawed-off rifle or shotgun partially covered by his clothing.  Ms. Ford then heard the gunshots and saw the two black males running away. She then exited her vehicle, told someone to call 911, and waited to help.[24]  Ms. Ford described the two males as around 20 - 30 years old, of medium height, and medium build.[25]   One black male had light brown skin and wore a dark jacket and white shirt, and the other black male had darker skin and wore dark clothing.[26]  The detectives showed Ms. Ford a series of photographs but she did not recognize anyone as the two black males.[27]

### *Tonya Keal*

On September 2, 1995, the detectives interviewed Tonya Keal, the victim's daughter.[28] Ms. Keal told the police she witnessed the shooting of her father through the window from her home located above her father's store.[29]  Ms. Keal recounted she had woken up in the night to take her son to the bathroom when she looked out her second-story bedroom window.[30]  She saw a black male walking back and forth in front of her father's, Mr. Keal's, store below her bedroom window.

Ms. Keal described the sounds as someone locked the door and then she moved to the other window and believed she heard Mr. Keal's voice and a scuffle.[31]  Ms. Keal then heard two gunshots and saw Mr. Keal face down on the sidewalk when a male stood over Mr. Keal and fired two shots into him.[32]  Ms. Keal described this black male as 5'6"-5'8" with a thin build, light brown complexion, wearing a baseball hat turned backwards, and "pulling a bandana up and down on face."[33]

Ms. Keal also saw a second man standing on the pavement in front of the gate.  Ms. Keal described the black male as having a dark complexion, wearing dark clothing, and holding a sawed off shotgun.[34]  Ms. Keal could not recall seeing either male before, and the detectives

showed Ms. Keal one of their four page spread of photographic arrays but she did not recognize any individual as the black males she saw in the early morning of August 31, 1995.[35]

### *Donita Mickeals*

On September 2, 1995, detectives interviewed Donita Mickeals. Ms. Mickeals told the detectives she was sitting on her steps at 33 W. Venango Street when she heard a "loud blast and three smaller pops."[36] Ms. Mickeals then saw three men running east on Venango Street and then they turned left to go north on 16th Street.[37] As the men got closer she recognized two of the men as "Tizz" and "Rolex," and the man she recognized as "Tizz" carried either a rifle or shotgun.

Ms. Mickeals explained she recognized two of the men from earlier that day, around 2 P.M., when she went to the Chinese store.[38] Ms. Mickeals stated three men were standing outside the store and one of the men approached her.[39] He introduced himself as "Tizz" and asked for her phone number, which she gave him. "Tizz" also informed her because she had a car she "could come by where he hangs at, in front of the Chinese Resteraunt [sic] at 54th & Baltimore Ave."[40] Ms. Mickeals also heard "Tizz" call out to one of the other two men and call him "Rolex."[41]

Ms. Mickeals recognized "Tizz" and "Rolex" as two of the males running from the shooting and told detectives she would recognize these males if she saw them again.[42] Detectives asked if she was available at a later date to look at a photographic array and she stated she was.[43] The detectives never asked Ms. Mickeals review a photographic array.

### *Jamal Bennett*

On September 8, 1995, the detectives interviewed Jamal Bennett. Mr. Bennett told the police he was sitting on the porch of his house on the 3600 block of North 17th Street. He

witnessed a "candy apple red" mini-van with dark windows moving south on 17th Street.[44]  The mini-van stopped and three black males got out but the driver remained in the minivan.[45]  Mr. Bennett stated the three men approached Mr. Keal and one of the males said "shot everybody, shot everybody."  Mr. Bennett also saw one of the males held a gun.[46]  This male shot Mr. Keal in the back of the leg and then in the back of the head.[47]  Mr. Bennett observed the three men go over to Mr. Keal and they "went in his pocket."[48]  The men then got into the mini-van and drove south on 17th Street before turning west on Venango Street.  Approximately 7 minutes after the van turned down Venango Street, Mr. Bennett "saw this van parked on the corner of 17th & Erie near the newsstand … [he] told the Offider [sic][, then the van drove off towards Broad Street."[49]  He told detectives he later heard the shooter stole $500 from Mr. Keal's pocket and through the "grapevine" the shooters names were Josh, Montel, and Terrell but did not know males with those names.[50]

Mr. Bennett described the three males to the detectives.  The black male with the gun had a dark-colored mask on which covered his nose and above the eyes; about 16 to 21 years old, had curly dark hair, and wore dark clothing.[51]  The gun was a handgun and looked like an automatic.[52]  The second black male was tall and skinny with "straight up hair, like he had a perm."[53]  The third black male had knotty hair and was less than 5'8" tall.  The detectives did not show Mr. Bennett any photographic arrays to identify the three males.

### Lance Felder

On September 12, 1995, the detectives interviewed Lance Felder.  Mr. Felder told the police he was with his friend, Phil, at the Chinese store near 17th and Tioga Streets when he heard two or three shots.[54]  Mr. Felder and Phil then ran from the Chinese store to Mr. Felder's home, 3621 North Gratz Street, and Mr. Felder's brother Bryon *a.k.a.* Robert Felder let them in.

Mr. Felder told his brother they heard gunshots and then he, Bryon, and Phil got into a white and blue car owned by a neighbor, Jimmy.[55]   They rode around the corner to where the shooting happened and when they arrived the police were there already so they stayed to watch the police investigate.[56]   The detectives asked Mr. Felder if he or anyone he was with shot or robbed anyone on August 31, 1995 and Mr. Felder answered no.[57]

### *Eugene Gilyard*

On September 12, 1995, the detectives interviewed Eugene Gilyard.  Mr. Gilyard told the police he did not see the shooting of Mr. Keal but he heard the shots from the Chinese store at 17th and Atlantic Streets.[58]   He told the detectives he saw two men running "through the grass behind Victoria Street."[59]   Mr. Gilyard could not describe the males because he was a block away from them and because his eyesight is bad.  He stated he did not see either male carrying a gun.[60]   The detectives asked Mr. Gilyard if he was involved in the shooting of Mr. Keal and he responded no.[61]

### *Keith Williams*

On September 18, 1995, the detectives interviewed Keith Williams.  Mr. Williams told the police he was on the porch of 1824 W. Atlantic Street with Patrick Harris when Mr. Keal was shot.[62]   Mr. Williams did not hear the gunshots but he heard sirens sometime after 2 A.M.[63]   He then saw two black males running at a "steady place" north on 18th Street before turning onto Atlantic Street heading west.[64]   One male slowed down at the corner of Atlantic and Gratz Street to wait for the second male then both males ran north on Gratz Street and into house number 3921, described as "Robbie's house."  Mr. Williams told detectives the two males remained in the house for about 5 minutes then they left with Robbie and another male.[65]   The two running males got into a white Pontiac with a blue top and a Pennsylvania plate no. G74 and the

unidentified male from Robbie's house got in too.[66]  The males drove the car south on Gratz Street then west on Atlantic Street then north on 19th Street.[67]  Robbie did not get in the car but went back inside his home.[68]

Mr. Williams described one of running males as 6' tall, light brown complexion, short hair, 145 pounds, and around 19-20 years old.[69]  This male wore brown clothes including a jacket and he carried a long black shotgun under this jacket in his left hand.[70]  He described the second running male as a little taller, darker-skinned, 150 pounds, and around 19-20 years old.[71]  This male wore an all-white t-shirt, light blue jeans and did not carry a gun.[72]

The detectives showed Mr. Williams photographic arrays and Mr. Williams identified Robbie in a photographic array.[73]  The detectives then showed Mr. Williams another and he identified Lance Felder as Robbie's brother.[74]  The detectives asked Mr. Williams if he saw Mr. Felder on August 31, 1995 and he said no.[75]  The detectives then asked Mr. Williams if Mr. Felder was one of the males who ran by him on August 31, 1995 and he said no.[76]

### B.      The September 1995 investigation did not lead to an arrest.

The detectives showed Ms. Ford, Ms. Keal, Mr. Williams, and Mr. Harris photographic arrays but no one could identify the two to three males they saw running.  The detectives did not show Ms. Mickeals, Mr. Bennett, Mr. Felder, or Mr. Gilyard photographic arrays to identify the suspects.  The detectives used photographic arrays with photographs of Lance Felder and Eugene Gilyard.[77]  Mr. Felder's photograph is on the first spread and Mr. Gilyard's photograph is on the second spread of the photographic array.[78]  Mr. Williams is the only witness to positively identify two people in the detectives' photographic array and he positively identified these two men, Robert Felder and Lance Felder, as not the suspects.  In September 1995, Detective

Centeno's investigation did not lead to an arrest, charges, or conviction of a person for the murder of Thomas Keal.

## C.    The December 1997 re-investigation.

In late December 1997, Detectives Dennis Dusak and John Benham of the Special Investigations Unit began investigating Mr. Neal's unsolved murder.   Detectives Dusak and Benham visited the homes of three witnesses, Ms. Keal, Mr. Williams, and Mr. Harris, to see if they could identify suspects.

### *Patrick Harris*

On December 30, 1997, Detectives Dusak and Benham interviewed Mr. Harris in his home.[79]  The Detectives showed Mr. Harris photographs and asked if "anyone looks familiar to you."[80]  The investigative interview record states, two years and four months after the shooting, Mr. Harris now identified Eugene Gilyard *a.k.a.* Eugene Stevenson as the black male he saw running and who dropped the gun.[81]   The Detectives' investigation interview record of Mr. Harris is two pages long and the page where he identifies Mr. Gilyard as the man who dropped the gun is unsigned.[82]

Detectives showed Mr. Harris another group of photographs but Mr. Harris could not recognize anyone in those photographs.[83]  The investigation interview record shows Mr. Harris' signature on this second page where his response "I can't recognize anyone" is recorded.[84]  The Detectives asked Mr. Harris four questions in total.[85]

### *Keith Williams*

The investigation interview record shows Detectives Dusak and Benham interviewed Mr. Williams in his home at 10:50 A.M. on New Year's Eve, December 31, 1997.[86]  The Detectives' investigation interview records show the detectives asked Mr. Williams two questions.[87]   The

Detectives showed Mr. Williams photographs and asked if he recognized anyone.[88]  Two years and four months after the shooting, the interview investigative record states Mr. Williams recognized Lance Felder.[89]  According to the interview investigative record, the Detectives asked, "he was one of the two males you saw running that morning, is that correct?" and Mr. Williams responded "[y]es.  I'm sure of it."  The interview investigative record does not reflect the Detectives inquired about Mr. Williams's September 18, 1995 positive identification of Lance Felder as someone he knew but not one of the two males who ran by him on August 31, 1995.[90]

### *Tonya Keal*

Forty minutes later, at 11:30 A.M. on New Year's Eve, December 31, 1997, Detectives Dusak and Benhem interviewed Ms. Keal in her home.[91]  The Detectives only asked Ms. Keal two questions.[92]  The Detectives showed Ms. Keal photographs from a tan folder and asked if she recognized anyone.[93]  Ms. Keal could not be sure she recognized anyone.[94]  The Detectives then asked Ms. Keal to look at "these photos" and, two years and four months after the shooting, Ms. Keal identified Eugene Gilyard *a.k.a.* Eugene Stevenson as the male she "saw walking back and forth in front of my father's house.  He was pulling a red bandana up over his face."[95]  In her September 2, 1995 interview, Ms. Keal described this black male as 5'6"-5'8" with a thin build, light brown complexion, wearing a baseball hat turned backwards, and "pulling a bandana up and down on face."[96]

### D.    Detectives Dusak and Benham's Affidavits of Probable Cause.

After Detectives Dusak and Benham completed their two-day year end 1997 investigation, Sergeant Tucker conferred with Assistant District Attorney Joe LaBar "on all

aspects of this case."[97]  On January 6, 1998, Detective Dusak swore nearly identical affidavits of probable cause against Mr. Gilyard and Mr. Felder:

On Thursday, August 31, 1995, at about 2:35AM, 39th District police responded to a radio call of a "shooting and hospital case" on the highway, 3600 N. 17th Street.  Upon arrival at that location, police found the victim, identified as Thomas KEAL, 54 year-old black male, lying on the highway with a shotgun wound to his right knee and a gunshot wound to his head.  He was transported to Temple University Hospital where he was pronounced dead at 2:50PM by Dr. GRABOWSKI.

On Thursday, August 31, 1995, inside the Office of the Medical Examiner, Dr. Edwin LIEBERMAN performed a post-mortem examination on the body of Thomas KEAL where he determined that the cause of death was from multiple gunshot wounds and the manner of death was homicide.

On Saturday 2, 1995, Tonya KEAL was interviewed inside the Homicide Division.  She stated, in summary, that in the early morning hours of Thursday, August 31, 1995, she awoke from bed to take her son to the bathroom.  She looked out the window and saw a black male walking up and down 17th Street, across the street from her father's variety store, located directly below her apartment at 3621 N. 17th Street.  This male was pulling a bandana up and down on his face.  KEAL stated she then heard the screen door open to her father's store and the sounds of someone locking the door.  KEAL stated that as she moved from the window to another window, she heard muffled voices, then heard two gunshots.  She looked out the window and saw her father, Thomas KEAL, lying on the sidewalk on his stomach.  The male she had seen earlier was standing over her father and this male fired two more gunshots into her father.  She further saw another male, standing by the gate, holding what appeared to be a sawed-off shotgun.  At this point, she ran to the phone to call the police.
On Wednesday, December 31, 1997, Tonya KEAL viewed a photographic array and positively identified a photograph of Eugene STEVENSON aka Eugene GILYARD (PP#782271) as the male she saw shoot and kill her father,
Tonya KEAL further stated that her father had a permit to carry a gun, and that he always had that gun with him.

On September 1, 1995, Patrick HARRIS was interviewed inside the Homicide Division.  He stated, in summary, that he was sitting on the steps in front of 1824 Atlantic Street with Keith WILLIAMS when he heard a lound [sic] boom that sounded like a shotgun, then two additional gunshots.  Shortly thereafter, he saw two black males, one light-skinned and the other dark-skinned, running west on Atlantic Street.  The dark skinned male was carrying a shotgun, and the light-skinned male was carrying a handgun.  Both males ran past him, and the light-skinned male dropped his handgun, then picked it back up, as they

neared Gratz Street.  Both males ran north on Gratz Street and into 3621 N. Gratz Street.  A minute later, both males, along with another male, came out of the house and got into a Pontiac and took off.

On Tuesday, December 30, 1997, Patrick HARRIS was shown a photographis [sic] array and he positively identified a photograph of Eugene STEVENSON aka Eugene GILYARD as the light-skinned male he saw running past him with a gun.

On September 1, 1995, Det. Thomas KANE recovered clothing at the Office of the Medical Examiner worn by the deceased at the time of his death.  Clothing included was a pair of black denim jeans with the right front pocket turned inside out, along with a brown waist-length clip-on style holster with a "cobra gunskin" label.  These articles were submitted to the Criminalistics Laboratory for processing.

The Pennsylvania State Police confirm that Thomas KEAL had a permit to carry a Ruger .357 caliber handgun, stainless-steel, serial number 57146496.

On September 1, 1995, Keith WILLIAMS was interviewed inside the Homicide Division.  He stated, in summary, that he was sitting on the steps in front of 1824 Atlantic Street with Patrick HARRIS when he heard sirens and saw two black males running past him.  The first male was carring [sic] a shotgun under his jacket in his left hand, and he slowed to let the second male catch up to him.  Both males then run up Gratz Street and into the house at 3621 Gratz Street.  HARRIS knows the male who lives in this house as ROBBIE, and these two males got into an old Pontiac, painted white with a blue top.  While ROBBIE when back into the house, WILLIAMS watched as the two males in the vehicle drove down Gratz Street and past him again on Atlantic Street.

On Wednesday, December 31, 1997, Keith WILLIAMS was shown a photographic array and he positively identified a photograph of Tyree WELLS a.k.a. Lance FELDER (PP#789144) as the male he saw running past him with the shotgun.

On September 12, 1995, Lance FELDER was brought into the Homicide Division for an interview.  He stated, in summary, that on the night of the shooting he was coming from the Chinese Store at 17th & Tioga with his friend, Phil, when he heard gunshots.  He and Phil then ran home to 3621 N. Gratz Street, then got into a car belonging to a neighbor.  In summary, Lance FELDER admitted that he was in the exact area of the shooting. [98]

### E. The arrest, conviction, and sentencing of Messrs. Gilyard and Felder.

On January 6, 1998, a magistrate judge or bail commissioner approved Detectives Dusak and Benham's affidavit for probable cause and issued arrest warrants for Eugene Gilyard and Lance Felder.[99] On January 8, 1998, officers arrested Messrs. Gilyard and Felder.

The District Attorney tried Messrs. Felder and Gilyard in the Philadelphia Court of Common Pleas. On December 10, 1998, the jury found Messrs. Felder and Gilyard guilty of first degree murder of Mr. Keal. Four days later, the jury returned a sentence of life for both men.[100]

### F. The Commonwealth exonerates Messrs. Gilyard and Felder.

On March 18, 2011 and on June 20, 2011, while serving a life sentence for another murder conviction, Ricky Welborne *a.k.a.* "Rolex" confessed to shooting Mr. Keal on August 31, 1998.[101] Mr. Welborne swore neither Eugene Gilyard nor Lance Felder had any part in the shooting.[102] He also confessed to shooting another man, Anthony Stokes, the day before he shot Mr. Keal.[103] Mr. Stokes never reported being shot, however, a certification from Mr. Stokes and his hospital records from the shooting collaborated Mr. Welborne's confession.[104] On May 6, 2013, "Rolex" confessed a third time.[105]

Messrs. Gilyard and Felder petitioned for relief under Pennsylvania's Post-Conviction Relief Act and the state court held numerous hearings on their petition. On October 8, 2013, Judge DeFino-Nastasi of the Philadelphia Court of Common Pleas vacated their sentences and ordered a new trial based the after-discovered evidence of Mr. Welborne's confession.[106] Judge DeFino-Nastasi found Mr. Welborne's confession was a statement against penal interest and the confession "contains internal indicia of reliability and is externally corroborated by other witnesses and physical evidence. And this is important because of the later statements by Mr. Welborne's in an attempt to recant, Mr. Welborne, himself, in his statement gives information to

the Innocence Project that leads them to Mr. Stokes. No one else knew that information."[107] Judge DeFino-Nastasi further ruled Messrs. Gilyard and Felder's case is "distinguishe[d]" from others because the "overall evidence supporting the convictions in this case was terribly weak. It consisted of inconsistent and highly unreliable identification testimony."[108]

On June 18, 2014, the District Attorney *nolle prossed* the charges against Messrs. Gilyard and Felder.

## II.    Analysis

Messrs. Gilyard and Felder sued the City of Philadelphia, Detective Dennis Dusak, Detective John Benham, and Detective William Wynn alleging malicious prosecution against the detectives and a *Monell* supervisory liability claim against the City of Philadelphia. They also allege Pennsylvania state law claims of unlawful arrest, malicious prosecution, unlawful incarceration, defamation, negligent infliction of emotional distress, intentional infliction of emotion distress, breach of fiduciary duty and government trust, invasion of privacy, unlawful restraint, abuse of process, and misuse of process.

Detective Dusak, Detective Benham, Detective Wynn, and the City of Philadelphia move for summary judgment on all claims.[109] Messrs. Gilyard and Felder withdrew their state law claims during oral argument. We grant Detective Wynn's motion for summary judgment because he played no part in Messrs. Gilyard and Felder's harm until after the officers arrested them so they cannot adduce facts of his involvement in a malicious prosecution. We deny Detective Dusak and Benham's motion for summary judgment because there are genuine disputes of material fact for a factfinder to resolve. We grant summary judgment for the City of Philadelphia on Messrs. Gilyard and Felder's *Monell* claim based on an alleged unconstitutional policy. We deny summary judgment for the City of Philadelphia on Messrs. Gilyard and

Felder's *Monell* claims based on failure to train and failure to supervise because there are genuine disputes of material fact for the factfinder.

### A. Messrs. Gilyard and Felder may proceed on their malicious prosecution claim against Detectives Dusak and Benham but not Detective Wynn.

Messrs. Gilyard and Felder allege Detectives Dusak, Benham, and Wynn maliciously prosecuted them by fabricating evidence and omitting inconsistent and exculpatory evidence in their affidavits of probable cause. Messrs. Gilyard and Felder must show: (1) the [Detectives] initiated a criminal proceeding; (2) the criminal proceeding ended in [Messrs. Gilyard and Felder's ] favor; (3) the proceeding was initiated without probable cause; (4) the [Detectives] acted maliciously or for a purpose other than bringing [Messrs. Gilyard and Felder] to justice; and (5) [Messrs. Gilyard and Felder] suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding."[110]

#### 1. Initiation of the criminal proceeding.

Detectives Dusak and Benham conducted the three identification interviews with eyewitnesses which created the factual basis for the January 6, 1998 affidavits of probable cause. Detectives in a § 1983 malicious prosecution claim "must have personal involvement in the alleged wrongs to be liable and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved."[111] While Detective Dusak swore the affidavits of probable cause, Detective Benham participated in the three identification interviews. Detective Benham also testified when he worked at the Special Investigations Unit, the partners "pretty much [] worked together" and did tasks by "mutual agreement" not because one partner is the lead detective.[112] Viewing the evidence in the light most favorable to Messrs. Gilyard and Felder, there is evidence Detectives Dusak and Benham initiated the criminal proceedings

against them by conducting the interviews and working together to build a factual basis for probable cause to arrest.

Detective William Wynn played no part initiating the criminal proceeding against Messrs. Gilyard and Felder because there is no evidence he participated in the three identification interviews or drafted the affidavits of probable cause. Detective Wynn did not take any action with Messrs. Gilyard and Felder until March 18, 1998, over two months after the police arrested them under Detectives Dusak and Benham's probable cause affidavits.

### 2. Without probable cause

Messrs. Gilyard and Felder allege Detectives Dusak and Benham fabricated evidence and omitted exculpatory and inconsistent eyewitness accounts in their affidavits for probable cause. Our review turns "on whether 'a reasonable officer could have believed that probable cause existed to arrest'" them.[113]

Detectives Dusak and Benham used a valid warrant to arrest Messrs. Gilyard and Felder. Where an officer uses a valid warrant, our probable cause inquiry addresses two elements: (1) whether the Detectives "with at least a reckless disregard for the truth, 'made false statements or omissions that create[d] a falsehood in applying for a warrant'"; and (2) "whether those assertions or omissions were 'material, or necessary, to the finding of probable cause.'"[114]

Our court of appeals instructs we assess the Detectives' reckless omissions and misrepresentations, then "perform literal, word-by-word reconstructions of the challenged affidavits", and then "finally, we assess the materiality of the omitted information to the probable cause determination."[115]

a.      **The Detectives' alleged reckless omissions and false statements.**

Detectives Dusak and Benham's alleged assertions and omissions were made with "reckless disregard" if when "viewing at the evidence, the [Detectives] must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information [they] reported."[116]

"Omissions are made with reckless disregard where 'an officer withholds a fact in his ken that '[a]ny reasonable person would have known…was the kind of thing the judge would wish to know.'"[117]  We address the affidavits for Messrs. Gilyard and Felder together because they are nearly identical.   While Messrs. Gilyard and Felder identify numerous omissions, misrepresentations, or fabricated evidence from Detectives Dusak and Benham's affidavits of probable cause, we focus on the key deficiencies associated with Ms. Keal, Mr. Harris, Ms. Mickeals, and Mr. Williams's identifications for the purposes of summary judgment:

### *Tonya Keal*

Detectives Dusak and Benham omitted from the affidavit the fact two days after witnessing her father's murder the earlier investigating detectives showed Tonya Keal only one of four photographic arrays of possible suspects which included Mr. Felder and Ms. Keal could not identify anyone in the photographic arrays as the two males who shot her father.  Detective Dusak and Benham also omitted the fact the photographic array they showed Ms. Keal on December 31, 1997 contained a photograph of Mr. Felder which she did not recognize.

### *Patrick Harris*

Detective Dusak and Benham omitted evidence the fact the earlier investigating detectives did not ask Patrick Harris to review photographic array of suspects on September 2, 1995.  Mr. Harris also disputes he ever identified Mr. Gilyard in a photographic array when

Detectives Dusak and Benham interviewed him on December 30, 1997. He testified he told the Detectives he could not recognize anyone.

### *Keith Williams*

Detective Dusak and Benham omitted evidence the fact the earlier investigating detectives showed Mr. Williams photographs of possible suspects and Mr. Williams could not identify any in the photographs as the two males he saw running that night. Mr. Williams did positively identify "Robbie" from his witness statement in the photographic array. Mr. Williams also positively identified Lance Felder in the photographic array as "Robbie's brother" who the detectives knew to be Lance Felder. Mr. Williams told the earlier investigating detectives Mr. Felder was not one of the two men who ran past him on August 31, 1995. The earlier investigating detectives also included Mr. Gilyard's photograph in the array but Mr. Williams did not identify him at all.

Mr. Williams also swears on December 31, 1997 he picked Lance Felder out in the photographs because Detectives Dusak and Benham "scared" him. Mr. Williams testifies he feared them because they came to his home two times and made him come to the roundhouse two times to look at photographs. He swears one of the Detectives "insisted that I identify someone" and they cursed and shouted at him. Then the other Detective "pushed my head towards the photos shouting at me to look closer" while the other Detective tapped "his finger on a specific photo telling me we know who did it." Mr. Williams swears he identified the photograph out of fear.[118]

*Donita Mickeals*

The Detective Dusak and Benham omitted Donita Mickeals' eyewitness statement telling the earlier investigating detectives she recognized the two males as "Rolex" and "Tizz." Ms. Mickeals also told those detectives she could identify the two males again and is willing to do so.

**b.      Analysis of reckless omissions**

Detectives Dusak and Benham's omissions, fabrications, and misrepresentations were reckless because their probable cause against Messrs. Gilyard and Felder is based entirely on these three eyewitnesses' accounts.

The Detectives' failure to include the fact Ms. Keal viewed one spread of photographs which included Mr. Felder on September 2, 1995 and was unable to identify anyone as the shooter is an omission which could undermine Ms. Keal's credibility because she is twice unable to identify Mr. Felder, the other alleged suspect.

Detective Dusak and Benham's omission of Ms. Mickeals' eyewitness statement is reckless because she is the only eyewitness who positively identified the two suspects and believed she could identify them again. Detectives Dusak and Benham "had obvious reasons to doubt the accuracy of the information [they] reported" regarding Ms. Keal's positive identification of Mr. Gilyard because they knew another witness who identified the males in 1995 had not been asked.[119] Because their probable cause is based entirely on eyewitness identifications the omission of the only eye witness who positively identified the suspects days after the shooting is reckless.

There are genuine issues of material fact whether the Detectives fabricated Mr. Harris's and coerced Mr. Williams's 1997 identifications for the factfinder to resolve. At this stage, we view all evidence in favor of Messrs. Gilyard and Felder. The Detectives knowingly disregarded

the truth by including the alleged fabrication of Mr. Harris 1997 identification of Eugene Gilyard, and it is "the kind of thing the judge would wish to know."[120]  The Detectives' omission of their alleged coercion of Mr. Williams to identify Lance Felder is also made with reckless disregard for the truth because the detectives "must have entertained serious doubts as to the truth of his statements" knowing they had allegedly coerced Mr. Williams into identifying the photograph of Mr. Felder.[121]

### c.    Reconstructed affidavit for probable cause.

We now reconstruct the January 6, 1998 affidavits for probable cause including alleged omissions and false statements and in the light most favorable to Messrs. Gilyard and Felder:

On Thursday, August 31, 1995, at about 2:35AM, 39th District police responded to a radio call of a "shooting and hospital case" on the highway, 3600 N. 17th Street.  Upon arrival at that location, police found the victim, identified as Thomas KEAL, 54 year-old black male, lying on the highway with a shotgun wound to his right knee and a gunshot wound to his head.  He was transported to Temple University Hospital where he was pronounced dead at 2:50PM by Dr. GRABOWSKI.

On Thursday, August 31, 1995, inside the Office of the Medical Examiner, Dr. Edwin LIEBERMAN performed a post-mortem examination on the body of Thomas KEAL where he determined that the cause of death was from multiple gunshot wounds and the manner of death was homicide.

On Saturday 2, 1995, Tonya KEAL was interviewed inside the Homicide Division.  She stated, in summary, that in the early morning hours of Thursday, August 31, 1995, she awoke from bed to take her son to the bathroom.  She looked out the window and saw a black male walking up and down 17th Street, across the street from her father's variety store, located directly below her apartment at 3621 N. 17th Street.  This male was pulling a bandana up and down on his face.  KEAL stated she then heard the screen door open to her father's store and the sounds of someone locking the door.  KEAL stated that as she moved from the window to another window, she heard muffled voices, then heard two gunshots.  She looked out the window and saw her father, Thomas KEAL, lying on the sidewalk on his stomach.  The male she had seen earlier was standing over her father and this male fired two more gunshots into her father.  She further saw another male, standing by the gate, holding what appeared to be a sawed-off shotgun.  At this point, she ran to the phone to call the police.  **[On September 2, 1995, Tonya KEAL viewed a photographic array which contained**

20

**photographs of Tyree WELLS aka Lance FELDER but Tonya KEALS did not recognize any photographs as the two men who shot her father].**

On Wednesday, December 31, 1997, Tonya KEAL viewed a photographic array and positively identified a photograph of Eugene STEVENSON aka Eugene GILYARD (PP#782271) as the male she saw shoot and kill her father. **[Tonya KEAL could not positively identify Tyree WELLS aka Lance FELDER in the photographic array.]**

Tonya KEAL further stated that her father had a permit to carry a gun, and that he always had that gun with him.

On September 1, 1995, Patrick HARRIS was interviewed inside the Homicide Division. He stated, in summary, that he was sitting on the steps in front of 1824 Atlantic Street with Keith WILLIAMS when he heard a lound [sic] boom that sounded like a shotgun, then two additional gunshots. Shortly thereafter, he saw two black males, one light-skinned and the other dark-skinned, running west on Atlantic Street. The dark skinned male was carrying a shotgun, and the light-skinned male was carrying a handgun. Both males ran past him, and the light-skinned male dropped his handgun, then picked it back up, as they neared Gratz Street. Both males ran north on Gratz Street and into 3621 N. Gratz Street. A minute later, both males, along with another male, came out of the house and got into a Pontiac and took off. **[The detectives did not ask Patrick HARRIS to review photo array of suspects on September 2, 1995.]**
~~On Tuesday, December 30, 1997, Patrick HARRIS was shown a photographis [sic] array and he positively identified a photograph of Eugene STEVENSON aka Eugene GILYARD as the light-skinned male he saw running past him with a gun.~~

On September 1, 1995, Det. Thomas KANE recovered clothing at the Office of the Medical Examiner worn by the deceased at the time of his death. Clothing included was a pair of black denim jeans with the right front pocket turned inside out, along with a brown waist-length clip-on style holster with a "cobra gunskin" label. These articles were submitted to the Criminalistics Laboratory for processing.

The Pennsylvania State Police confirm that Thomas KEAL had a permit to carry a Ruger .357 caliber handgun, stainless-steel, serial number 57146496.

On September 1, 1995, Keith WILLIAMS was interviewed inside the Homicide Division. He stated, in summary, that he was sitting on the steps in front of 1824 Atlantic Street with Patrick HARRIS when he heard sirens and saw two black males running past him. The first male was carring [sic] a shotgun under his jacket in his left hand, and he slowed to let the second male catch up to him. Both males then run up Gratz Street and into the house at 3621 Gratz Street. ~~HARRIS~~ **[WILLIAMS]** knows the male who lives in this house as ROBBIE **[, and the two runners, ROBBIE, and another male. The unknown male and**

**the two runners]** ~~and these two males~~ got into an old Pontiac, painted white with a blue top. While ROBBIE when back into the house WILLIAMS watched as the ~~two~~ **[three]** males in the vehicle drove down Gratz Street and past him again on Atlantic Street. **[Keith WILLIAMS viewed a photographic array and positively identified ROBBIE in the photographs. WILLIAMS also positively identified "ROBBIE's brother" aka Tyree WELLS aka Lance FELDER in the photo array. WILLIAMS told detectives "ROBBIE's brother" was not one of the two men who ran past him on August 31, 1995. WILLIAMS did not identify Eugene STEVENSON aka Eugene Gilyard whose photograph was also included.]**

On Wednesday, December 31, 1997, **[after we interviewed Keith WILLIAMS twice, in his home and once at the Roundhouse, viewed photographic arrays but could not recognize anyone as the two males he saw on August 31, 1995. We then took WILLIAMS to the Roundhouse and insisted he identify someone.]** Keith WILLIAMS was show a photographic array **[We cursed and shouted at him. One of us then pushed WILLIAMS' head towards the photographs while the other tapped his finger on a specific photo of the person we believed murdered Thomas KEAL]** and he positively identified a photograph of Tyree WELLS aka. Lance FELDER (PP#789144) as the male he saw running past him with the shotgun.

**[On September 2, 1995, Donita MICKEALS was interviewed inside the Homicide Division. MICKEALS was sitting on her steps at 33 W. Venango Street when she heard a "loud blast and three smaller pops." MICKEALS then saw three men running on east on Venango Street and then they turned left to go north on 16th Street. As the men got closer MICKEALS recognized two of the men as "Tizz" and "Rolex" and the man she recognized as "Tizz" carried either a rifle or shotgun.**

**MICKEALS recognized the two men from earlier that day when she went to the Chinese store around 2pm. MICKEALS stated three men were standing outside the store and one of men approached her. The man introduced himself as "Tizz" and asked for her phone number, which she gave him. "Tizz" also informed her because she had a car she "could come by where he hangs at, in front of the Chinese Resteraunt [sic] at 54th & Baltimore Ave." MICKEALS also heard "Tizz" call out to one of the other two men and call him "Rolex."**

**MICKEALS recognized "Tizz" and "Rolex" as two of the males running from the shooting and told detectives she would recognize these males if she saw them again. Detectives asked if she was available at a later date to look at a photo array and she stated she was.]**

On September 12, 1995, Lance FELDER was brought into the Homicide Division for an interview. He stated, in summary, that on the night of the shooting he was coming from the Chinese Store at 17th & Tioga with his friend, Phil, when he heard gunshots. He and Phil then ran home to 3621 N. Gratz Street,

then got into a car belonging to a neighbor. In summary, Lance FELDER admitted that he was in the exact area of the shooting.

### d. Materiality

We review the reconstructed affidavit to determine whether the knowing assertions and recklessly omitted statements are "material, or necessary, to the finding of probable cause."[122] We can grant summary judgment only if "we must conclude that 'no reasonable jury could find facts that would lead to the conclusion' that the reconstructed affidavit 'lacked probable.' "[123]

While "a positive identification by a [] witness, without more, would usually be sufficient to establish probable cause, … [i]ndependent exculpatory evidence or substantial evidence of the witness's own unreliability that is known by arresting officers could outweigh the identification such that probable cause would not exist."[124]

### *Probable cause against Lance Felder*

As to the Detectives' probable cause against Mr. Felder, the reconstructed evidence shows the Detectives' alleged coercion of Mr. Williams and pressure to identify Mr. Felder as the suspect even though Mr. Williams did not recognize him as the suspect is "substantial evidence" of the unreliability of Mr. Williams's positive identification and exculpatory evidence for Mr. Felder. The addition of Mr. Williams's closer in-time positive identification of Mr. Felder as not one of the two males he saw running on August 31, 1995 is material evidence which is both exculpatory and is further substantial evidence of the unreliability of Mr. Williams's 1997 identification of Mr. Felder. A reasonable jury could find the Detectives coerced Mr. Williams and intentionally omitted his earlier exculpatory identification of Mr. Felder, leaving only Mr. Felder's own statement to the Detectives he was at the Chinese store a few blocks away when he heard the shooting as evidence of probable cause.

*Probable cause against Eugene Gilyard*

The reconstructed affidavit now only cites Ms. Keal's eyewitness identification of Mr. Gilyard. Detectives Dusak and Benham's omission of Ms. Mickeals' eyewitness identification both possibly excludes exculpatory evidence and misleads the magistrate as to Ms. Keal's credibility as a witness.

In *Andrews v. Scuilli*, our court of appeals recently held when probable cause rests on the evidence of one witness, we "cast a brighter light" on the evidence and "the significance of any consistency or discrepancy in the witness' evidence is enhanced because these are the only indicia of the witness' reliability that are available."[125] In *Andrews*, a 15 year old female victim told Officer Scuilli a man demanded she get in his car.[126] The victim described the man as a white male with dark hair, around 35 years old and described his vehicle as a red four door sedan with a Pennsylvania license plate with "ACG."[127]

The next day, the victim and her mother were at the grocery store when the victim told her mother she saw the car that stopped her.[128] The car's license plate is JDG4817.[129] The victim saw the driver and stated it was the same man from the day before and her mother informed Officer Scuilli.[130] Officer Scuilli researched plate JDG4817 and found David Andrews owned the car.[131] The officer then created a photographic array including Mr. Andrews' license photograph and the victim identified Mr. Andrews.[132] Officer Scuilli then looked at Mr. Andrews's car and learned the car is a red three-door coupe.[133]

Officer Scuilli swore an affidavit of probable cause which changed the victim's description to "a middle aged white male with dark hair with streaks of gray." The affidavit also stated the victim stated his car was a red four door sedan and "the victim spotted this same vehicle" the next day.[134] The court approved the warrant and Officer Scuilli arrested Mr.

Andrews.[135]  The court tried Mr. Andrews and found him not guilty.[136]  Mr. Andrews then sued

Officer Scuilli for false arrest and malicious prosecution.[137]

Our court of appeals identified each of Officer Scuilli's false and misleading assertions

and omissions and reconstructed the affidavit of probable cause.  The court reviewed the

misleading and false assertions about the victim's description of Mr. Andrews and found

"standing alone, they would not be material to probable cause."[138]

The court of appeals found the omitting the victim's conflicting identification of the

vehicle and license plate number is material because it is the piece of evidence which caused

Officer Scuilli to create of photographic array based off Mr. Andrews' photograph.  Our court of

appeals held because the victim was the sole "source of information about a crime and

perpetrator does, logically, cast a brighter light on any body of evidence she or he provides.  In

such cases, the significance of any consistency or discrepancy in the witness' evidence is

enhanced because these are the only indicia of the witness' reliability that are available."[139]  The

court of appeals concluded the victim's inconsistency in describing the car and the car she

identified "inexorably, leads to the conclusion [the victim] must have been … mistaken" one of

the days.  Officer Scuilli's omissions were material because they hid "a discrepancy that

potentially undermines the sole witness' reliability" and the factfinder must decide if the

reconstructed affidavit had probable cause.[140]

In the reconstructed affidavits of probable cause we now review, the Detectives only

identify Ms. Keal as an eyewitness to the shooting of her father and the only witness to identify

Mr. Gilyard as the shooter.  In *Andrews*, the court found persuasive the officer's omission of

victim's inconsistent testimony about the man's car being the sole link leading Officer Scuilli to

Mr. Andrews.  Unlike *Andrews* but as compelling, the Detectives, not the witness, provided the

sole link from Ms. Keal to Mr. Gilyard by presenting her with his photograph in December 1997.[141]  The detectives present Ms. Keal as the sole "source of information" about the man who shot her father and as in *Andrews*, we "cast a brighter light" on the evidence she provides and the importance of her inconsistencies is "enhanced" as the only indicia of her reliability.[142]

As represented in the original affidavits of probable cause, the magistrate could have believed the Detectives had not identified Mr. Gilyard as a suspect until New Year's Eve December 31, 1997 when they showed up at Ms. Keal's door with his photograph in the array which would make her positive identification more credible.  The omission of Ms. Keal's inability to identify Mr. Felder in 1995 and in 1997 is material to her credibility because a magistrate could weigh her inability to identify one of males twice against her ability to recognize the male "pulling a bandana up and down on his face" two years and four months after she saw him at 2:30 A.M. from a second story window.

Detectives Dusak and Benham are "not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists."[143]  In the reconstructed evidence, the inculpatory evidence against Ms. Gilyard is an eyewitness identification of his photograph two years and four months after she witnessed the shooting.  She is an eyewitness who could not identify the other suspect when shown his photograph in 1995 and 1997.  This one eyewitness identification is arguably not substantial inculpatory evidence so the exculpatory evidence of Ms. Mickeals' unexplored positive identifications is even more material evidence for the magistrate to consider.

Detectives Dusak and Benham's alleged omissions and false statements are material because a reasonable jury could find the reconstructed affidavit lacked probable cause, it relied squarely on eye-witness identifications and the reconstructed affidavit creates serious doubts as

to the one eye-witness who identified Mr. Gilyard based on credibility and exculpatory evidence and contained no eye-witness identification of Mr. Felder. We leave to the jury whether Detectives Dusak and Benham's reconstructed affidavits state probable cause against Messrs. Gilyard and Felder.

### 3. Detectives Dusak's and Benham's acts of malice.

Messrs. Gilyard and Felder allege facts to show Detectives Dusak and Benham "acted maliciously or for a purpose other than bringing [Mr. Gilyard and Mr. Felder] to justice." Our court of appeals expressed uncertainty if a plaintiff even needs to demonstrate the defendants acted with malice for a § 1983 malicious prosecution claim. The court has "specifically questioned the continuing validity of the malice requirement, reasoning that "if the harm alleged is a seizure lacking probable cause, it is unclear why a plaintiff would have to show that the [defendants] acted with malice."[144]

A reasonable jury could find Detectives Dusak and Benham acted without probable cause when they arrested Messrs. Gilyard and Felder. Even if our court of appeals requires a higher standard, the allegation Detectives Dusak and Benham fabricated one witness's identification and coerced another witness's identification is enough for a jury to find they acted with malice and not to bring Messrs. Gilyard and Felder to justice.

### 4. Proceedings subsequently terminated in Messrs. Gilyard's and Felder's favor.

The state court proceedings terminated in favor of Messrs. Gilyard and Felder because the court vacated their original sentences and then the District Attorney formally abandoned the proceedings against them. The District Attorney formally abandons criminal proceedings by entering a *nolle prosequi*.[145] "A *nol pros* signifies termination of charges in favor of the accused '*only when their final disposition is such as to indicate the innocence of the accused*.'"[146]

We "examin[e] the entire criminal proceeding" to determine if the judgment "indicates the plaintiff's innocence of the allege misconduct underlying the offenses charged."[147]   After months of hearings on Messrs. Gilyard and Felder's Post-Conviction Relief Act asking for a new trial, Judge DeFino-Nastasi vacated their sentences and ordered a new trial based on the after-discovered evidence of Mr. Welborne's confessions.[148]  This holding indicates the innocence of Messrs. Gilyard and Felder because she credits Mr. Welborne's confessions to the murder of Mr. Keal which necessary means Messrs. Gilyard and Felder did not murder him.   The District Attorney, aware of Judge DeFino-Nastasi's holding, then entered *nolle prosequi* for the charges against Mr. Gilyard and Mr. Felder.

The Detectives argue Mr. Welborne's recanted confession now means the proceedings did not indicate the innocence of Messrs. Gilyard and Felder.    This argument ignores Judge DeFino-Nastasi's thorough review of each of Mr. Welborne's confessions, prison calls, and his attempts to recant and her well-reasoned ruling finding Mr. Welborne's confessions credible as a statement against penal interest and because it "contains internal indicia of reliability and is externally corroborated by other witnesses and physical evidence." [149]   The judge specifically found his later attempts to recant his confessions as not credible.

Based on the extensive post-discovery record, we find the proceeding terminated in Messrs. Gilyard and Felder's favor because a judge vacated their life sentences 15 years after their convictions on the basis of another person's credible confession and the District Attorney then abandoned the charges against them.

### 5.    Messrs. Gilyard and Felder suffered deprivation of liberty.

Messrs. Gilyard and Felder demonstrate evidence they "suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding."[150]  Philadelphia

police officers arrested Messrs. Gilyard and Felder based on the affidavits of probable cause on January 6, 1998. Messrs. Gilyard and Felder remained incarcerated from their arrest through the conviction and life sentences until Judge DeFino-Nastasi vacated their sentences in October 2013 then the state placed them under house arrest, restricting their liberty, until June 18, 2014 when the District Attorney *nolle prossed* the charges against them.

**B.    Qualified Immunity does not apply.**

Detectives Dusak and Benham argue qualified immunity bars the malicious prosecution claim against them because their conduct did not violate Messrs. Gilyard and Felder's constitutional rights, and even if their conduct did violate, "[i]t was not 'clearly established' as of the date of [Messrs. Gilyard and Felder's] arrest that it was constitutionally impermissible to undertake the actions taken by [the Detectives] in this present case."[151]   To overcome qualified immunity, Messrs. Gilyard and Felder must allege the Detectives "(1) violated [their] civil rights;" and, (2) "the right in question was clearly established at the time of the violation."[152] Viewing the facts in the light most favorable to Messrs. Gilyard and Felder, the Detective include a fabricated witness identification, coerced a second witness into making an identification, and omitted a possibly exculpatory witness identification

Messrs. Gilyard and Felder adduce sufficient facts to show the Detectives could have violated their civil rights.   Over four years before the Detectives prepared the affidavits of probable cause, our court of appeals held when "a police officer causes an arrest to be made pursuant to a warrant which he obtained on the basis of statements he knew to be false or on the basis of statements he knew to be false or on the basis of statements he makes in reckless disregard of the truth, a plaintiff may recover damages under section 1983 for 'unreasonable seizure' of his person in violation of the Fourth Amendment."[153]   As detailed above, Messrs.

Gilyard and Felder adduced sufficient evidence for a reasonable jury to find Detectives Dusak and Benham obtained the affidavits for probable cause relying on fabricated witness identification, coerced witness identifications, and omitting exculpatory evidence and could be liable for damages.

Messrs. Gilyard and Felder's right to free from prosecution and its attendant Fourth Amendment seizure was clearly established on January 6, 1998. The Detectives' conduct "violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right."[154]  To determine if the right is "clearly established" we look to Supreme Court precedent or a "robust consensus of cases of persuasive authority."[155]

In 1993, our court of appeals relying on 1986 Supreme Court precedent held "if a police officer submits an affidavit containing statements he knows to be false or would know are false if he had not recklessly disregarded the truth, the officer obviously failed to observe a right that was clearly established.  Thus, he is not entitled to qualified immunity."[156]  In January 1998, the contours of Messrs. Gilyard and Felder's right to be free from prosecution and its attendant deprivation of freedom based on fabrications and coerced witness statements was "clearly established" and we deny the Detectives' claim for qualified immunity.

C.    **Messrs. Gilyard's and Felder's two *Monell* claims against the City.**

Messrs. Gilyard and Felder allege three variations of *Monell* supervisory liability claims against Philadelphia: (1) Commissioner Neal implemented a policy, Directive 139, which give the officers unconstitutional guidance on probable cause requirements to exclude exculpatory evidence from an affidavit; (2)  Commissioner Neal failed to supervisor the officers by failing to correct their unconstitutional understanding the probable cause requirements allowed them to

exclude exculpatory evidence from an affidavit; and, (3) Commissioner Neal failed to train the officers in a constitutionally compliant understanding of probable cause which included submitting exculpatory evidence with an affidavit.

While neither side addresses the pertinent facts to Messrs. Gilyard and Felder's *Monell* claims in their statement of undisputed facts in compliance with Fed. R. Civ. P. 56(c)(1), Messrs. Gilyard and Felder cite four pieces of evidence in their briefing to support their *Monell* claims.[157]

### *Directive 139*

Philadelphia Police Department's Directive 139 defines probable cause as "[t]he existence of facts and circumstances that would justify a person of reasonable caution to believe: * that an offense has been or is being committed; * that the particular person or item to be seized is reasonably connected to the crime; AND *that the person can be found at a particular place or the item can be found in the possession of a particular person or at a particular place."[158]

### *Detective Dennis Dusak*

Detective Dusak testified he only puts inculpatory evidence into affidavits for probable cause and his understanding is shared by "[his] partners, [his] supervisor, [his] captain, the district attorney."[159] Detective Dusak testified his supervisors looked at the evidence against Messrs. Gilyard and Felder and "absolutely" agreed the inculpatory evidence outweighed the exculpatory evidence.[160] When asked if he puts exculpatory evidence in an affidavit for probable cause, Detective Dusak testified "[n]o, that's not done."[161] Detective Dusak also testified "common sense" tells him not to include exculpatory evidence because he would be less likely to get his arrest warrant approved.[162]

### *Detective Joseph Centeno*

Detective Centeno testified he "only put the evidence of the person that said they did do it. But [he] wouldn't have any items that said he didn't do it" so he could get the arrest warrant approved.[163] Detective Centeno testified his affidavits for probable cause are reviewed by his sergeant and a lieutenant in the unit or captain.[164] The Police Academy taught Detective Centeno about probable cause but using a directive which pre-dated the 1994 Directive 139.[165]

### *Detective Karyn Baldini*

Detective Baldini testified she is not aware of "any case where any Philadelphia police officer has included exculpatory information in an affidavit of probable cause for the issuance of an arrest warrant."[166]

Messrs. Gilyard and Felder argue Directive 139 is constitutionally flawed *and* the Police Department disregarded this constitutionally flawed directive and established a practice to exclude exculpable evidence from affidavits of probable cause.

### 1. Unconstitutional policy

To allege a § 1983 *Monell* claim against the City of Philadelphia, Messrs. Gilyard and Felder must identify a policy or custom because "municipal liability attaches only when 'execution of a government policy or custom ... inflicts the injury.' "[167] The crux of Messrs. Gilyard and Felder's argument is Directive 139, enacted by Commissioner Neal in 1994, is constitutionally deficient in its probable cause definition because it fails to instruct officers to include exculpatory evidence.

Probable cause under the Fourth Amendment is when a magistrate judge considers the "totality-of-the-circumstances" and makes a "practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him [or her] … there is a fair probability that

contraband of evidence of a crime will be found in a particular place."[168] Almost forty years ago, in *Franks*, the Supreme Court held an officer can violate a citizen's Fourth Amendment rights if the affidavit for probable cause contains affirmative false statements or statements made with reckless disregard for the truth and those statements are necessary to the probable cause finding.[169]

Our court of appeals did not hold a plaintiff can allege a Fourth Amendment violation based on an officer's omissions of material exculpatory evidence until 2000. By 1990, however, the Court of Appeals for the Tenth Circuit joined six other circuits in extending the *Franks* standard for affirmative falsehood and reckless disregard to include situations where an officer omits a material fact from the affidavit of probable cause.[170] The Court of Appeals for the Tenth Circuit specifically applied *Franks* to the omission of exculpatory evidence. In *Stewart*, an officer's failure to include the key witness's recantation of his accusation in the affidavit for probable cause "was a clearly established violation of plaintiff's Fourth and Fourteenth Amendment rights [because the officer] knowingly or recklessly omit[ted] from an arrest affidavit information which, if included, would vitiated probable cause." The Court of Appeals for the Fifth Circuit also held, in 1988, an officer could violate a plaintiff's Fourth Amendment right by omitting facts "tending to dissipate probable cause" from an affidavit.[171]

We review the Supreme Court's definition of probable cause together with a snapshot of the persuasive caselaw from other circuits as of January 1998, and taken together they do not definitively establish an officer's failure to include exculpatory evidence in an affidavit for probable cause is *per se* unconstitutional. Instead, they held where an officer knows exculpatory evidence and the exculpatory evidence may vitiate probable cause then an officer may violate the Fourth Amendment by omitting it from his or her sworn affidavit.

Messrs. Gilyard and Felder's argument could work if Directive 139 affirmatively instructed officers not to include exculpatory evidence but it does not. We grant the City of Philadelphia's motion for summary judgment on Messrs. Gilyard and Felder's *Monell* unconstitutional policy theory because as of 1998, the Philadelphia Police's Directive 139 instructing officers to include information "reasonably connecting" the person to crime is not unconstitutional on its face.

2. **Failure to train**

To succeed on a failure to train claim, Messrs. Gilyard and Felder must show Commissioner Neal, the policymaker, made a "deliberate" or "conscious" decision to not train or supervise his officers in constitutionally sufficient probable cause.[172] "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for . . . failure to train."[173]

The Philadelphia Police and Commissioner Neal should have been aware of the need to train their officers in how to deal with exculpatory evidence. Particularly, they should have trained officers they could not unilaterally omit credible exculpatory evidence which if believed by the magistrate would vitiated their probable cause to arrest a suspect. While officers are "reasonable and prudent [wo]men" and not "legal technicians," a lay person would agree if an officer knows three important facts, two of which suggest a person did it and one which suggests the person didn't do it, the officer should not hide the 'didn't do it' fact from the judge when asking to arrest the suspect.[174] Detective Dusak testified he does not put exculpatory evidence into any affidavit for probable cause because it would lessen his chances of getting the warrant approved. Detective Dusak also testified he learned to always exclude exculpatory evidence from "common sense." Detective Dusak's testimony demonstrates the Philadelphia Police did

not train officers in how to evaluate material exculpatory evidence and when it is necessary to include the exculpatory evidence in the affidavit.

Messrs. Gilyard and Felder demonstrate a pattern of similar instances for their failure to train claim because three detectives admitted they never put exculpatory evidence into their affidavits for probable regardless of the materiality to probable cause.  One of the detectives also testified his partners, supervisors, captains, and the district attorney shared his understanding to exclude exculpatory evidence from affidavits for probable cause and another detective went so far as to testify she is not aware of any Philadelphia Police officer who includes exculpatory evidence.

Deliberate indifference can also be shown from a single incident "'in a narrow range of circumstances' where unconstitutional actions are the obvious consequence of a failure to train."[175] In 2014, a district court held "a reasonable jury could conclude that, because police officers do not come to their jobs trained in the law, a municipality's failure to train them on how to handle exculpatory evidence has the obvious consequence of leading to constitutional violations, such that a single incident can give rise to *Monell* liability."[176]  Messrs. Gilyard and Felder adduce evidence of a single incident because Detective Dusak testified his understanding to exclude exculpatory evidence came from "common sense."

Alternatively, Messrs. Gilyard and Felder may prove deliberate indifference by showing: "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights."[177]  A reasonable jury could find Philadelphia Police policy makers are aware their officers and detectives prepare affidavits of probable cause in investigations where some evidence is

inculpatory and some is exculpatory.  A reasonable jury could also find the policymakers were aware this situation creates a difficult choice because the officers will be motivated to bring a suspect to justice and the wrong choice, excluding exculpatory evidence, will frequently cause officers to seize people without probable cause.

Messrs. Gilyard and Felder demonstrate these three elements are present. They adduced evidence the Philadelphia Police knew Detectives Dusak and Benham prepare affidavits of probable cause and their supervisors knew the Detectives uncovered both inculpatory and exculpatory evidence because Detective Dusak testified his supervisors looked at the evidence against Messrs. Gilyard and Felder and "absolutely" agreed the inculpatory evidence outweighed the exculpatory evidence.   The Philadelphia Police were also aware the wrong choice by Detectives Dusak and Benham to exclude exculpatory evidence could lead an arrest without probable cause in violation of the Fourth Amendment.

### 3. Failure to supervise

To proceed with failure to supervise, Messrs. Gilyard and Felder must demonstrate the Philadelphia Police had "contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate."[178]

Messrs. Gilyard and Felder adduced evidence the Philadelphia Police had "contemporaneous knowledge of the offending incident."[179]   Detective Dusak testified his supervisors looked at the evidence against Messrs. Gilyard and Felder and "absolutely" agreed the inculpatory evidence outweighed the exculpatory evidence.[180]   Detective Dusak then excluded the exculpatory evidence from the affidavit.

Messrs. Gilyard and Felder also adduce evidence the Philadelphia Police had "knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate."[181]  Detective Centeno, a member of the Philadelphia Police force from 1986, testified his supervisors reviewed every affidavit of probable cause he prepared and he did not include exculpatory evidence them.  Both Detective Centeno and Detective Dusak testified their supervisors were aware they did not include exculpatory evidence in their affidavits and approved/did not correct their affidavits which a reasonable jury could find "communicated a message of approval" to Detectives Centeno and Dusak.[182]

We deny summary judgment for the City of Philadelphia because Messrs. Gilyard and Felder demonstrate sufficient evidence on *Monell* liability for their failure to train and failure to supervise theories for a reasonable jury could find in their favor.

## III.    Conclusion

We grant summary judgment on Messrs. Gilyard and Felder's state law claims as withdrawn.   We grant summary judgment for Detective Wynn on the malicious prosecution claim because Detective Wynn did not investigate or prepare the affidavit of probable cause against Mr. Gilyard and Mr. Felder.  We deny summary judgment for Detectives Dusak and Benham because a reasonable jury could find they maliciously prosecuted Mr. Gilyard and Mr. Felder.  We grant summary judgment for the City of Philadelphia because Messrs. Gilyard and Felder fail to demonstrate the Philadelphia Police had an unconstitutional policy for *Monell* liability.  We deny summary judgment for the City of Philadelphia because Messrs. Gilyard and Felder demonstrate sufficient facts for a jury to find in favor of their *Monell* claims based on failure to train and failure to supervisor liability.

[1] We consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to" Messrs. Gilyard and Felder "the part[ies] opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted). Our Policies require a Statement of Undisputed Material Facts be filed in support of a Rule 56 motion, as well as an appendix of exhibits. The Defendants together filed a Statement of Undisputed Material Facts and Appendix at ECF Doc. Nos. 69-71. Messrs. Gilyard and Felder responded to the Defendants' Statement of Undisputed Facts at ECF Doc. No. 77 and additional Appendix at ECF Doc. No. 78.

[2] ECF Doc. No. 71 at 1.

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] *Id.* at 3.

[7] ECF Doc. No. 78-9 at 20.

[8] *Id.*

[9] *Id.*

[10] *Id.* at 21.

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.* at 22.

[17] *Id.* at 9.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.* at 4.

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.* at 14.

[28] *Id.* at 15.

[29] *Id.*

[30] *Id.* at 16.

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.* at 17.

[36] *Id.* at 30.

[37] *Id.* at 31.

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] *Id.* at 34.

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.* at 34-35.

[52] *Id.* at 35.

[53] *Id.*

[54] *Id.* at 38.

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.* at 39.

[59] *Id.*

[60] *Id.* at 40.

[61] *Id.*

[62] *Id.* at 23.

[63] *Id.*

[64] *Id.* at 24.

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] *Id.* at 23.

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] *Id.* at 24.

[74] *Id.* at 25.

[75] *Id.*

[76] *Id.*

[77] ECF Doc. No. 71 at 25; ECF Doc. No. 78-3 at 16, 18-19.

[78] *Id.*

[79] ECF Doc. No. 71 at 43.

[80] *Id.*

[81] *Id.* Mr. Harris disputes he identified Mr. Gilyard's photo to the police and we address this issue in our analysis. We also note every other witness, including Mr. Harris, signed every page of their interview investigation record in the investigation file for Mr. Keal's murder.

[82] *Id.* at 44.

[83] *Id.*

[84] *Id.*

[85] *Id.* at 43-44.

[86] *Id.* at 42.

[87] *Id.*

[88] *Id.*

[89] *Id.*

[90] *Id.*

[91] *Id.* at 41.

[92] *Id.*

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] *Id.* at 16.

[97] *Id.* at 1.

[98] *Id.* at 45-50.

[99] *Id.* at 1.

[100] *Id.*

[101] ECF Doc. No. 78-5 at 9; ECF Doc. No. 78-8 at 2-5.

[102] ECF Doc. No. 78-5 at 9; ECF Doc. No. 78-8 at 2-5.

[103] *Id.*

[104] ECF Doc. No. 78-9 at 2-20.

[105] *Id.* at 10-14.

[106] ECF Doc. No. 71-17 at 41.

[107] *Id.* at 37.

[108] *Id.* at 41.

[109] Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). On a motion for summary judgment, "we view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Mancini v. Northampton Cnty.*, 836 F.3d 308, 313 (3d Cir. 2016) (quoting *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014)). "The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their care for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Willis*, 808 F.3d at 643 (citing *Celotex Corp.*, 477 U.S. at 322-23).

[110] *Andrews v. Scuilli*, 853 F.3d 690, 697 (3d Cir. 2017) (quoting *DiBella v. Borough of Beechwood*, 407 F.3d 599, 601 (3d Cir. 2005).

[111] *See Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007) (internal citations omitted).

[112] ECF Doc. No. 71-7 at 37.

[113] *Andrews*, 853 F.3d at 697 (quoting *Wilson v. Russo*, 212 F.3d 781, 786-87 (3d Cir. 2000)).

[114] *Id.* (quoting *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 468-69 (3d Cir. 2016)).

[115] *Dempsey*, 834 F.3d at 469-70.

[116] *Andrews*, 853 F.3d at 698 (quoting *Wilson*, 212 F.3d at 788).

[117] *Id.* (quoting *Dempsey*, 834 F.3d at 471).

[118] ECF Doc. No. 78-7 at 7.

[119] *Andrews*, 853 F.3d at 698 (quoting *Wilson*, 212 F.3d at 788).

[120] *See id.*, 853 F.3d at 698 (quoting *Dempsey*, 834 F.3d at 471).

[121] *Id.* (quoting *Wilson*, 212 F.3d at 788).

[122] *Dempsey*, 834 F.3d at 471 (quoting *Wilson*, 212 F.3d at 787).

[123] *Id.* (quoting *Wilson*, 212 F.3d at 787).

[124] *Wilson*, 212 F.3d at 790.

[125] *Andrews*, 853 F.3d at 704.

[126] *Id.* at 694.

[127] *Id.* at 695.

[128] *Id.*

[129] *Id.*

[130] *Id.*

[131] *Id.*

[132] *Id.*

[133] *Id.*

[134] *Id.* at 696.

[135] *Id.*

[136] *Id.*

[137] *Id.*

[138] *Id.* at 702-703.

[139] *Id.* at 704.

[140] *Id.* at 705.

[141] *See id.* at 705.

[142] *See id.*

[143] *Dempsey*, 834 F. 3d at 469 (quoting *Wilson*, 212 F. 3d at 790).

[144] *Backof v. New Jersey State Police*, 92 Fed. App'x. 852, 859 n. 10 (3d Cir. 2004) (citing *Gallo v. City of Philadelphia*, 161 F.3d 217, 222 n. 6 (3d Cir. 1998)).

[145] *Donahue v. Gavin*. 280 F.3d 371, 383 (3d Cir. 2002) (internal citations omitted).

[146] *Id.*

[147] *Kossler v. Crisanti*, 564 F.3d 181, 188 (3d Cir. 2009).

[148] ECF Doc. No. 71-17 at 41.

[149] *Id.* at 37.

[150] *Andrews*, 853 F.3d at 697 (quoting *DiBella*, 407 F.3d at 601).

[151] ECF Doc. No. 68 at 15.

[152] *Schneyder v. Smith*, 653 F.3d 313, 319 (3d Cir. 2011).

[153] *Lippay v. Christos*, 996 F.2d 1490, 1502 (3d Cir. 1993) (citing *Forster v. County of Santa Barbara,* 896 F.2d 1146, 1148 (9th Cir.1990) (per curiam) (adopting the standard of determining the validity of search warrants enunciated by *Franks v. Delaware,* 438 U.S. 154 (1978) in permitting section 1983 plaintiffs to recover for violations of the Fourth Amendment); *Haupt v. Dillard,* 794 F.Supp. 1480, 1490 (D.Nev.1992) (same)).

[154] *Mirabella v. Villard*, 853 F.3d 641, 648 (3d Cir. 2017) (internal citations omitted).

[155] *See id.*

[156] *Lippay*, 996 F.2d at 1504 (citing *Malley v. Briggs*, 475 U.S. 335, 345 (1986)).

[157] Messrs. Gilyard and Felder only allege a narrow *Monell* theory based the Philadelphia Police's policy, training, and supervising of officers' based on failing to require including exculpatory evidence and do not allege *Monell* theories relating to their claims the Detectives fabricated evidence and coerced witnesses.

[158] ECF Doc. No. 66-2 at 3.

[159] ECF Doc. No. 71-8 at 19-20.

[160] *Id.* at 19.

[161] *Id.*

[162] *Id.*

[163] ECF Doc. No. 78-4 at 10-11.

[164] *Id.* at 11.

[165] *Id.* at 9.

[166] ECF Doc. No. 78-5 at 11.

[167] *Lawson v. City of Coatesville*, 42 F. Supp. 3d 664, 678 (E.D. Pa. 2014) (quoting *Monell v. New York Dept. of Social Servs.*, 436 U.S. 658, 694 (1978)).

[168] *United States v. Williams*, 124 F.3d 411, 420 (3d Cir. 1997) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

[169] *See Franks*, 438 U.S. at 155-56.

[170] *Stewart v. Donges*, 915 F.2d 572, 582 (10th Cir. 1990).

[171] *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988) ("As a corollary, moreover, of the rule that the police may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause.").

[172] *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)

[173] *Simpson v. Ferry*, 202 F. Supp. 3d 444, 455 (E.D. Pa. 2016) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011) and *Bd. of Cnty. Commrs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409, (1997)).

[174] *See Gates*, 462 U.S. at 231.

[175] *Crews v. Cty. of Nassau*, 996 F. Supp. 2d 186, 210 (E.D.N.Y. 2014) (quoting *Connick*, 563 U.S. at 64).

[176] *Id.* (citing *Gregory v. City of Louisville,* 444 F.3d 725, 753–54 (6th Cir.2006)).

[177] *Simpson*, 202 F. Supp. 3d at 455 (citing *Ancherani v. City of Scranton*, No. 13-2595, 2015 WL 5924366 at *4 (M.D. Pa. Oct. 9, 2015) and *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir.1999)).

[178] *Id.* (internal citations omitted).

[179] *Id.* (internal citations omitted).

[180] ECF Doc. No. 71-8 at 19.

[181] *Simpson*, 202 F. Supp. 3d at 455.

---

[182] ECF Doc. No. 71-8 at 19.